UNITED STATES of America,
Plaintiff

v.

UNITED STEELWORKERS OF AMER-
ICA et al., Defendants.

Civ. A. No. 18242.

United States District Court
W. D. Pennsylvania.

Oct. 21, 1959.

George Cochran Doub, Asst. Atty. Gen., Hubert I. Teitelbaum, U. S. Atty., Pittsburgh, Pa., Donald B. MacGuineas, and Harland F. Leathers, Attys., Dept. of Justice, Washington, D. C., for plaintiff.

Goldberg, Feller & Bredhoff, Washington, D. C., J. Alfred Wilner, Wilner, Wilner & Kuhn, Pittsburgh, Pa., Ernest G. Nassar, Pittsburgh, Pa., for defendant.

SORG, District Judge.

### INJUNCTION

This cause having come on for hearing on the 20th day of October, 1959, upon a petition of the United States of America for an injunction pursuant to Section 208 of the Labor Management Relations Act of 1947 (29 U.S.C.A. § 178), and the parties having stipulated by their respective counsel that (1) the defendants, and each of them, waive service of process and submit themselves to the jurisdiction of the Court (2) the case be submitted to the Court for final hearing immediately upon the filing of the petition and (3) at such hearing all parties submit their evidence by way of affidavits and exhibits, without oral testimony, and, the Court having considered the evidence submitted herein by way of affidavits, the pleadings, memoranda of law and argument of counsel:

Now, Therefore, it is this 21st day of October, 1959, by the United States District Court for the Western District of Pennsylvania, ordered:

1. That the defendants, and each of them, and their officers and agents, and all persons in active concert or participation with them, be and they are hereby

enjoined and restrained (a) from in any manner continuing, encouraging, ordering, aiding, engaging or taking part in a strike or lockout in any of the operations of the employer defendants and their subsidiaries with respect to which the members of the defendant United Steelworkers of America are now on strike pertaining to the production of iron and ingot molds and the manufacture, rolling, drawing, forging, fabricating, storage and distribution of steel and steel products, including the mining and transport of iron ore and other component materials necessary for the production of iron and steel, and (b) from in any manner interfering with or affecting the orderly continuance of work therein.

2. That the members of the defendant United Steelworkers of America, acting in concert, be and they hereby are restrained and enjoined from in any manner continuing, encouraging, ordering, aiding, engaging in or taking part in any strike or lockout at the facilities or operations of the employer defendants and their subsidiaries described in the preceding paragraph hereof, or from in any manner interfering with, or affecting, the orderly continuance of work at such places, and from taking any action which would interfere with this Court's jurisdiction in the premises; provided, however, that nothing in this paragraph shall be construed to require an individual employee to render labor or service without his consent or to make the quitting of his labor or service by an individual employee an illegal act, nor shall the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees be deemed a strike under this paragraph.

3. That the defendant, the United Steelworkers of America, its president and other appropriate officers, agents and employees, be and they are hereby directed: (a) to instruct, immediately, all its members (i) who are employees of the employer defendants and (ii) who are engaged in any of the operations described above to resume their normal employment forthwith; (b) to give notice forthwith to all its members of the terms of this Order by posting a copy of such Order at the headquarters of the United Steelworkers of America at 1300 Commonwealth Building, Pittsburgh, Pennsylvania, and such posting will be deemed to constitute notice of this Order to all members of the United Steelworkers of America; and (c) to take all other appropriate action which may be necessary to insure that such directions are carried out.

4. That, during the period of this injunction unless and until new agreements are executed between the employer defendants and the United Steelworkers of America, the employees of the employer defendants represented by the United Steelworkers of America shall be employed under the terms and conditions of all agreements in effect on June 30, 1959 between the employer defendants and the United Steelworkers of America.

5. That, during the period of this injunction, the several defendants are directed to engage in free collective bargaining in good faith for the purpose of resolving their labor disputes and to make every effort to adjust and settle their differences.

6. This Order shall remain in full force and effect until the further order of this Court.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause having come on for hearing on the application of plaintiff, the United States of America, for an injunction, as prayed for in its verified petition, and the Court having considered all evidence submitted herein, the pleadings, memoranda of law, and argument of counsel, makes the following Findings of Fact and Conclusions of Law with respect to said application:

### FINDINGS OF FACT

1. On October 9, 1959, the President of the United States, acting under the national emergency provisions of the Labor Management Relations Act, 1947 (61

Stat. 155, 29 U.S.C.A. § 176) issued Executive Order 10843 (24 F.R. 8249), U.S. Code Congressional and Administrative News, 1959, p. ——, whereby he appointed a Board of Inquiry to inquire into the issues involved in labor disputes between employers in the steel industry which produce at least 85% of the steel production of the United States, and certain of their employees represented by the United Steelworkers of America (hereinafter sometimes referred to as the "Union"). In the Executive Order the President expressed the opinion that such disputes had resulted in a strike affecting a substantial part of the steel industry, an industry engaged in trade, commerce and transportation among the several states and with foreign nations and in the production of goods for commerce, and that the strike, if permitted to continue, would imperil the national health and safety. On October 14, 1959 the President issued Executive Order 10848 (24 F.R. 8401), U.S.Code Congressional and Administrative News, 1959, p. ——, extending to October 19, 1959 the date upon which the Board of Inquiry was to report to him.

2. The Board of Inquiry so convened by the President inquired into the issues involved in the disputes and rendered its written report to the President on October 19, 1959.

3. On October 19, 1959, after receipt of the report, the President directed the Attorney General, pursuant to the provisions of Section 208 of the Act (29 U.S. C.A. § 178), to petition in the name of the United States any district court of the United States having jurisdiction of the parties to enjoin the continuance of such strike and for such other relief as might be necessary or appropriate. In his communication to the Attorney General, the President stated that in his opinion the unresolved labor dispute had resulted in a strike affecting a substantial part of an industry engaged in trade, commerce and transportation among the several States and with foreign nations and in the production of goods for commerce, which strike, if permitted to continue, would imperil the national health and safety.

4. On October 20, 1959, the Attorney General filed a petition on behalf of the United States of America in this Court for an injunction against the defendants named in the petition.

5. Each of the defendants has by stipulation waived service of process and submitted to the jurisdiction of this Court and agreed that the case should be submitted to the Court for final hearing immediately upon the filing of the petition with evidence limited to affidavits and exhibits.

6. The defendants, except the Union, by stipulation waived their right to file any responsive pleading. The answer of the Union has been filed and the affidavits and exhibits of the parties received in evidence.

7. This suit was commenced under the national emergency provisions of the Act (Sections 206–210, 29 U.S.C.A. §§ 176–180).

8. The strike by the defendant Union consisted of a concerted stoppage of work on the part of that defendant and did not constitute the exercise of the right of individual employees to quit their labor as set forth in Section 502 of the Act (29 U.S.C.A. § 143).

9. The strike on the part of the Union resulted from unresolved labor disputes between defendant employers, who are engaged in one or more of the various stages of steel production, including the mining and transport of iron ore by railroad or vessel, the operation of blast furnaces for the conversion of iron ore into pig iron, the production of steel ingots, the rolling and shaping of steel ingots into various shapes and forms of steel products, and the fabricating of certain finished products, and certain of their employees represented by the Union.

10. The Board of Inquiry made an investigation of the issues and attempted to have the defendants resolve the dispute by free and collective bargaining. These efforts on the part of the Board of

Inquiry were unsuccessful and the disputes remain unresolved.

11. The report of the Board of Inquiry concludes that "the parties have failed to reach an agreement and we see no prospects for an early cessation of the strike. The board cannot point to any single issue of any consequence whatsoever upon which the parties are in agreement." Unless the Court grants the injunction sought by the United States the strike will continue for an indeterminate period.

12. The strike affects a substantial part of the steel industry of the United States, which is engaged in trade, commerce and transportation among the several States and with foreign nations and in the production of goods for commerce.

13. The strike, which commenced on July 15, 1959 and has continued until the present time, has resulted in the closing on July 15, 1959 of facilities producing at least 85% of the total steel production of the United States. Inventories of steel have dropped from 24,800,000 tons on July 15, 1959 to approximately 10,000,000 tons. This is below the normal inventory level and is below the level required to sustain continued production of industries and businesses dependent upon steel products. Approximately 500,000 striking members of the Union are now unemployed and more than 265,000 employees are idle in other industries by reason of the steel strike. The 765,000 unemployed support families numbering over 2,000,000 persons. If the strike were to continue, the total number of workers made idle by it would probably reach approximately 1,775,000 by the end of November and approximately 3,000,000 by the end of December. By that time more than 9,000,000 people would probably be affected by the strike.

14. On October 16, 1959 the Business and Defense Services Administration of the Department of Commerce issued an order requiring top priority to be given by steel producers to items required for use under the programs of the Department of Defense, including missiles, launching sites and nuclear vessels. This order applied immediately to steel producers which have not been shut down by the strike. It could not, however, meet the essential requirements of the Department of Defense because many of the special steel products it needs are not carried in inventory or produced by the plants still in operation.

15. The strike, which has now been in existence for more than 95 days, if permitted to continue, will imperil the national health and safety in the following respects:

(a) Certain items of steel required in top priority military missile programs of the United States are not made by any mill now operating, nor available from any inventory or from imports. Any further delay in resumption of steel production would result in an irretrievable loss of time in the supply of weapons systems essential to the national defense plans of the United States and its allies.

(b) The planned program of space activities under the direction of the National Aeronautics and Space Administration has been delayed by the strike and will be further delayed if it is continued. Specifically, project Mercury, the nation's manned satellite program, which has the highest national priority, has been delayed by reason of delay in construction of buildings essential to its operation. This program is important to the security of the nation. Other planned space programs will be delayed or threatened with delay by a continuation of the strike.

(c) Nuclear Submarines and the naval shipbuilding program other than submarines, including new construction, modernization, and conversion, have been affected by reason of the inability to secure boilers, compressors, and other component parts requiring steel. Products of the steel industry are indispensable to the manufacture of such items and delay in their production will irreparably injure national defense and imperil the nation.

(d) Exported steel products are vital to the support of United States bases

overseas and for the use of NATO allies and similar collective security groups. The steel strike, if permitted to continue, will seriously impair these programs, thus imperiling the national safety.

(e) A continuation of the strike will have the ultimate effect of adversely affecting millions of small business enterprises, almost all of which are directly or indirectly dependent upon steel products and most of which lack the resources to stock large inventories. In addition, it will have the effect of idling millions of workers and a large proportion of the facilities in industries dependent upon steel for their continued operation. Manufacturing industries directly dependent on steel mill products account for the employment of approximately 6,000,000 workers and normal annual wages and salaries totalling approximately $34,000,000,000. The products of these industries are valued at over $125,000,000,000. The national health will be imperiled if the strike is permitted to continue.

16. Such results, if the strike is permitted to continue, will imperil the national health and safety and thereby cause irreparable damage and injury to the United States of America for which there is no adequate remedy at law.

CONCLUSIONS OF LAW

1. This action was properly instituted under the national emergencies provisions of the Labor Management Relations Act of 1947, Sections 206–210 (29 U.S.C.A. §§ 176–180).

2. The statutory provisions of Sections 206 to 208 of the Act were in all respects fully and legally complied with, both prior to, and at the commencement of this suit by the United States of America.

3. The Court has jurisdiction of the subject matter of this suit and of the parties.

4. The work stoppage was a strike on the part of the United Steelworkers of America and did not constitute the exercise of the right of individual employees to quit their labor as set forth in Section 502 of the Act.

5. The strike is one affecting a substantial part of an industry engaged in trade, commerce and transportation among the several States and with foreign nations and engaged in the production of goods for commerce.

6. The strike, if permitted to continue, will imperil the national health and safety and thereby cause irreparable injury to the United States of America for which there is no adequate remedy at law.

7. Plaintiff, the United States of America, is entitled to the relief prayed for.